IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


DON R. HUBBARD,                        )
                                       )
                Plaintiff,             )   Civil No. 06-43-JE
                                       )
        v.                             )   OPINION AND ORDER
                                       )
BIMBO BAKERIES USA, INC., a            )
Delaware corporation, d/b/a            )
OROWHEAT BAKERIES,                     )
                                       )
                Defendant.             )
_____)

        Richard C. Busse
        Matthew B. Duckworth
        Busse & Hunt
        521 American Bank Building
        621 S.W. Morrison Street
        Portland, OR 97205
            Attorneys for Plaintiff

        Edwin A. Harnden
        Todd A. Hanchett
        Barran Liebman LLP
        601 S.W. Second Avenue, Suite 2300
        Portland, OR 97204-3159
            Attorneys for Defendant


1 - OPINION AND ORDER

JELDERKS, Magistrate Judge:

Plaintiff Don Hubbard brings claims of wrongful constructive discharge, sex discrimination, and retaliation against defendant Bimbo Bakeries, USA, Inc. (Bimbo), dba Orowheat Bakeries.  Defendant moves for summary judgment.  For the reasons set out below, the defendant's motion for summary judgment is granted.

## FACTUAL BACKGROUND

Plaintiff started working as a baker for defendant Bimbo on July 31, 2002.

Defendant Bimbo's policies prohibit sexual harassment and provide procedures for making and investigating complaints of harassment.  When he began working for defendant, plaintiff signed a form acknowledging that he had reviewed and understood the company's harassment policies.

Plaintiff worked at defendant's facility in Beaverton, Oregon.  Plaintiff's duties originally included removing bread packages from a conveyor belt and placing them on various racks for shipment to Bimbo's customers.  Defendant Bimbo promoted plaintiff to a swing shift distribution foreman position 90 days later.  In that position, plaintiff supervised a swing shift crew of 8 to 14 employees, and oversaw the flow and accuracy of customer orders.

During the time plaintiff worked for defendant Bimbo, his supervisor was Kris Kanyo.

2 - OPINION AND ORDER

In his work as a distribution foreman, plaintiff had to interact with employees in the production and transportation departments to facilitate movement of orders to defendant Bimbo's depots in Alaska, Hawaii, and Idaho.  He sometimes had to direct truck drivers to move trailers.  Plaintiff was an hourly employee, and did not have the authority to discipline or terminate other employees.  Kanyo had that authority.

In October 2004, Rick Felty, a driver in the transportation department whose position was subordinate to that of plaintiff, complained to Kanyo about plaintiff.  Felty told Kanyo that plaintiff failed to work cooperatively with him, and that plaintiff made negative comments, including statements that truck drivers were "lazy" and "should be written up for not doing their job."  Kanyo met with plaintiff, and told him that employees needed to work as a team, and that negative comments should not be exchanged between the transportation and distribution departments.

In early April 2005, Felty again complained to management about plaintiff's alleged uncooperativeness, use of profanity, and physically threatening conduct.  In a meeting with Kanyo, plaintiff denied Felty's allegations.  Plaintiff stated that he was "very uncomfortable" around Felty, that he did not know "where [Felty] was coming from," and that he had avoided contact with Felty because of concern that his comments would be taken out of context.  Kanyo told plaintiff that he needed to set an example because he was in a leadership role, and

that he had to keep his emotions in check.  In his report of the conversation, Kanyo noted that plaintiff was "frustrated with the situation," and had "not been subjected to such a diverse work environment."

Plaintiff went to Ellis Johnson, defendant Bimbo's Human Resources Manager, two times to talk about his concerns about Felty.  According to Johnson's deposition testimony, during their first meeting, plaintiff stated that he thought Felty was gay.  Johnson testified that, in response to his questioning, plaintiff stated that Felty had not touched him or said anything inappropriate to him.  Plaintiff has testified that, after he told Johnson that Felty had not touched or fondled him, Johnson told him to ignore Felty's conduct and not to retaliate.  The parties agree that, after plaintiff said he thought that Felty was gay, Johnson thought "if he's gay, he's protected," and did not want plaintiff to do anything to make Felty feel that he was being harassed.

On May 18, 2005, Kanyo met with plaintiff, Felty, the manager of the transportation department, and a union representative to discuss the conflict between plaintiff and Felty.  According to Kanyo's notes summarizing the meeting, Felty and plaintiff were told that they needed to work together in a professional manner, that communication between their departments was essential, and that they needed to refrain from joking about each other.  According to his declaration submitted in support of defendant Bimbo's motion

4 - OPINION AND ORDER

for summary judgment, Johnson knew of "no further complaints
or meetings to address the working relationship between
[plaintiff] and Felty after the May 18th meeting."

According to plaintiff's deposition testimony, beginning
in December 2004, plaintiff thought Felty was "coming on to
him" because Felty was "over-friendly" and discussed "non
work-related issues." Plaintiff testified that Felty asked
him "about sexual preferences," and that he responded by
telling Felty that he was heterosexual.

Plaintiff has also asserted that, in January or February
2005, Felty made comments about how plaintiff looked. These
allegedly included comments about plaintiff's tan "a couple of
times," the observation that plaintiff had lost weight, and
Felty's statement between two and five times, that plaintiff
was "looking good." Plaintiff also stated that, though Felty
never touched him, he "would consistently try to get into"
plaintiff's "space," tried to get close to him "several
times," and made "like smooching sounds" once or twice when
plaintiff walked away. Plaintiff testified that he told Kanyo
about Felty's conduct "a couple of times" in early 2005, and
that Kanyo told him to "keep [his] cool and try to ignore it."
He further testified that he told Human Resources that "Felty
was asking questions that were not of a work nature," that
Felty was trying to get into his "space," and that Felty was
"trying to pick up" on him.

5 - OPINION AND ORDER

Plaintiff testified that, after Felty complained about him during the spring of 2005, he talked with Felty in an attempt to reduce problems with him.  Felty said that he wanted to have a "relationship" with plaintiff, who interpreted the remark as a request for a romantic relationship.  Plaintiff told Felty that he was not gay. Felty responded that he was not gay, either.

Plaintiff testified that he reported Felty's comment about a "relationship" to Kanyo and to Human Resources, that Kanyo said he was sure that Felty was referring to "just a working relationship," and that plaintiff should come back and report if Felty touched him.  Plaintiff has testified that he was "shocked" at that response, and "realized at that point that they weren't going to do anything about it."  He further testified that he tried to avoid Felty after that, which Felty resented, and that Felty almost ran over him with a truck and pulled trailers in front of him in the lot to "cut him off" a few times while he was examining trailers.

According to plaintiff's deposition testimony, in August or September 2005, Felty asked him if he had a "big dick," and stated that "he liked that sort of thing."  Plaintiff added that he reported these comments to Kanyo, and asked "What do I have to do to get this stopped?  Hire an attorney?"  Plaintiff testified that Kanyo did not respond to this question.

Felty, who is married and has children, asserts that he is heterosexual.

6 - OPINION AND ORDER

Another of plaintiff's former co-workers at defendant Bimbo, James Marshall, the production supervisor on the shift that plaintiff worked, is openly gay. Plaintiff testified that he "had to deal with derogatory comments, because [Marshall] was gay." He testified that Marshall jokingly made a masturbation gesture with his hand in plaintiff's presence on one occasion, and once, when plaintiff had a cold, asked if plaintiff had been "sucking too much dick." Plaintiff stated that Marshall asked this question "because that's what happened with [Marshall], his throat would be sore . . . . So he automatically thought that – – or was just giving me crap about that, because he knew I wasn't gay." Plaintiff testified that he reported Marshall's comment to Kanyo, and spoke with Kanyo about Marshall two to four times between December 2004 and February 2005. He also testified that Marshall made comments about anal sex and "the same type of derogatory stuff . . . to try to gross you out, I guess," and asked plaintiff if he enjoyed anal sex. Plaintiff testified that Marshall also made such comments to other employees, that he reported Marshall's comments to Kanyo, and that Kanyo said he "didn't want to hear about it."

Kanyo testified that plaintiff never said that Felty commented about his tan, asked personal questions about his sexual preferences, or made plaintiff feel uncomfortable by "invading" his space. Kanyo added that, if a complaint of

sexual harassment came to his attention, he would "take it to
human resources," which would investigate.

Johnson testified that Kanyo never told him that
plaintiff complained to him about Marshall's conduct.

On September 27, 2005, Kanyo told plaintiff that he was
being transferred from its Beaverton facility to its Tigard
distribution facility, which was located approximately five
miles away.  Plaintiff testified that Kanyo told him that he
needed him at the Tigard facility, and testified that the
transfer "would put it in a worse situation with Mr. Felty,
as he was one of the persons who was supplying the Tigard
distribution with the supplies they needed."  He also
testified that Tigard "was an isolated situation, where there
was no management there - - not Kris [Kanyo] - - not HR,
nobody . . . ."

According to Johnson's testimony and declaration, Kanyo
wanted to move plaintiff to the Tigard facility temporarily to
cross train in the foreman position because the Tigard foreman
had sustained a back injury, and the Tigard facility was
slightly more physically demanding.  Kanyo has also testified
that the transfer was intended to be temporary, and would have
provided cross-training for plaintiff and the foreman at the
Tigard facility, who was to be transferred to Beaverton.
Plaintiff and Kanyo had previously discussed the possibility
of plaintiff working at the Tigard facility to see how that
facility functioned.  A transfer to the Tigard facility would

not have resulted in a change in plaintiff's title, rate of pay, or responsibilities.

Plaintiff did not report for work at the Tigard facility, but instead stopped working for defendant Bimbo. He has testified that he told Kanyo that he would not work at the Tigard distribution center because it was "more isolated," and that he could not "do this anymore . . . in this capacity." He also testified that he thought Dr Kanyo attempted to transfer him in retaliation for his complaints based upon "the mood" between himself and Kanyo, which "didn't seem very friendly," and seemed to indicate that Kanyo was tired of plaintiff's complaints and that Bimbo management was "trying to get rid" of him. Plaintiff asserts that the attempted transfer to Tigard was to have been permanent.

Marshall testified that he had never received any formal training from Human Resources regarding inappropriate workplace behavior. Felty testified that less than an hour of his eight-hour orientation was devoted to issues of discrimination, and that fifteen minutes of that time was devoted to sex discrimination. Kanyo did not investigate any complaints concerning Felty or Marshall on plaintiff's behalf, and defendant Bimbo did not discipline Felty or Marshall for any conduct related to plaintiff.

## PLAINTIFF'S CLAIMS

Plaintiff's first amended complaint includes three claims.  The first claim alleges that defendant Bimbo wrongfully constructively terminated plaintiff by maintaining a sexually hostile and/or retaliatory work environment, which "was so intolerable a reasonable person in Plaintiff's position would resign," and that defendant continued to maintain that environment "with the intent that Plaintiff resign, and/or with knowledge that if its actions continued it would be substantially certain he would do so."

Plaintiff's second claim, brought pursuant to 42 U.S.C. § 2000e, et seq., alleges that plaintiff was subjected to unwelcome sexual harassment by male employees of defendant Bimbo, that plaintiff repeatedly complained to defendant about that harassment, and that defendant nevertheless continued to maintain a sexually hostile and/or retaliatory work environment, with the intent that plaintiff would resign, or with the knowledge that his resignation would be substantially certain.

Plaintiff's third claim, which is based upon the same factual allegations, alleges unlawful sex discrimination and retaliation in violation of Oregon statutes.


## STANDARDS FOR EVALUATING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material

fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case. Id. When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. Id. at 324.

The substantive law governing a claim or defense determines whether a fact is material. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party. Id. at 630-31. The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985). No genuine issue for trial exists, however, where the record as a whole could not lead the trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).


**DISCUSSION**

I. Exhaustion of Title VII Administrative Requirements

Defendant Bimbo contends that plaintiff's Title VII

claims are barred because plaintiff failed to properly exhaust his administrative remedies.

A. Procedural Background

Plaintiff filed his original complaint in this action in state court on December 13, 2005,[1] pleading a single claim of wrongful constructive discharge based upon plaintiff's alleged subjection to "unwelcome sexual harassment by male employees of Defendant, which conduct was unwelcome to Plaintiff."

On December 16, 2005, plaintiff filed a complaint of unlawful discrimination with the Oregon Bureau of Labor and Industries (BOLI), alleging that he had been subjected to a "hostile same-sex sexual working environment," had been retaliated against for complaining about that harassment, and had been constructively terminated because of his sex "and or . . . complaints."

On January 10, 2006, defendant Bimbo removed this action to this court pursuant to 28 U.S.C. §§ 1441 based upon the diversity of the parties' citizenship.

On February 17, 2006, BOLI issued plaintiff a "right to sue" letter and dismissed plaintiff's BOLI complaint. The letter indicated that plaintiff had informed BOLI of his "intention to go to court." Of course, at that time he had already been "to court," at least as to his wrongful constructive discharge claim, for some two months.

---

[1]Defendant incorrectly states that the action was filed "in federal court on December 13, 2005." Defendant's memorandum in support of motion for summary judgment, p. 9.

12 - OPINION AND ORDER

On April 19, 2006, plaintiff filed an amended complaint adding federal sex discrimination claims pursuant to Title VII and parallel state-law claims to the wrongful discharge claim asserted in his original complaint.

B. Requirements for Bringing Claims Pursuant to Title VII and Analysis as to Present Action

The parties correctly agree that, before a Title VII claim may be brought in this court, a plaintiff must exhaust his administrative remedies by filing a timely charge with the Equal Employment Opportunity Commission (EEOC) or the appropriate state agency.  42 U.S.C. § 2000e-5(b); see, e.g., Stache v. International Union of Bricklayers and Allied Craftsmen, 852, F.2d 1231, 1233 (9th Cir. 1988) (exhaustion of administrative remedies required before bringing action pursuant to Title VII).  This administrative requirement must be satisfied in order for a court to properly assert subject matter jurisdiction over Title VII claims.  Vasquez v. County of Los Angeles, 349 F.3d 634, 644 (9th Cir. 2004).  A court's subject matter jurisdiction "extends to all claims of discrimination that fall within the scope of" the agency's actual investigation or of an "investigation that could reasonably be expected to grow out of the charge." B.K.B. v. Maui Police Dept., 276 F.3d 1091, 1100 (9th Cir. 2002).  A court may not consider allegations of discrimination that are not included in a plaintiff's administrative charge "unless

13 - OPINION AND ORDER

the new claims are 'like or reasonably related to the allegations contained in the EEOC charge.'"  Id. (internal quotations omitted).  A plaintiff's civil claims are reasonably related to the allegations included in a charge filed with the agency "to the extent that those claims are consistent with the plaintiff's original theory of the case." Id.

     There is no doubt here that any agency investigation of the wrongful constructive termination claim set out in plaintiff's BOLI complaint would necessarily encompass the claims of sexual harassment and retaliation brought under Title VII and Oregon statutory law in the second and third claims in plaintiff's first amended complaint.  The second and third claims are based upon the allegations of a "hostile same-sex sexual working environment" and alleged retaliation for complaints about that harassment that support plaintiff's constructive termination BOLI charge.

     More problematic is plaintiff's filing of a wrongful constructive termination claim, alleging same-sex sexual harassment and his complaints to defendant about that harassment, in state court before filing his BOLI charge. Oregon Revised Statutes § 659A.870 provides that "the filing of a civil action by a person in circuit court, pursuant to ORS 659A.885, or in federal district court under applicable federal law, waives the right of the person to file a complaint with [BOLI]  . . . under ORS 659A.820 with respect

to the matters alleged in the civil action."  Similarly, Or. Rev. Stat. §659A.820(2) provides that no BOLI charge may be filed "if a civil action has been commenced in state or federal court alleging the same matters."

Plaintiff's original state court complaint alleged one claim, captioned "Wrongful Constructive Discharge."  In support of that claim, plaintiff alleged that he "was subjected to unwelcome sexual harassment by male employees of Defendant," that he repeatedly complained about that harassment, and that defendant continued to maintain "a sexually hostile and/or retaliatory work environment" with the intent that he would resign, or with the knowledge that he would be substantially certain to do so.  In his complaint filed in state court, plaintiff did not cite or specifically rely upon state or federal statutes prohibiting sexual harassment or retaliation based upon complaints of such harassment.

The BOLI charge plaintiff filed three days later did allege that plaintiff had been constructively terminated. However, unlike plaintiff's complaint filed in state court, the BOLI charge did not allege the common law tort of <u>wrongful</u> constructive discharge, but instead simply alleged that plaintiff had been constructively terminated.  More significantly, unlike the state court complaint, the BOLI charge specifically cited and relied upon Title VII and its Oregon counterpart, Or. Rev. Stat. § 659A.030 <u>et</u> <u>seq.</u>, which

prohibit the sort of conduct alleged in support of plaintiff's charge of constructive termination.

Though this arguably presents a close issue, I conclude that the complaint plaintiff filed in state court and the charge plaintiff filed with BOLI did not allege the "same matters" within the meaning of the statutes cited above. Instead, though both are based upon some of the same underlying conduct, the "matter" alleged in the state law complaint is a state common law claim, while the "matter" presented in the BOLI charge is violation of state and federal law prohibiting sex-based discrimination and retaliation in response to complaints about such conduct.  Accordingly, I conclude that plaintiff exhausted his administrative remedies by filing a BOLI charge alleging violations of federal and state laws prohibiting discrimination before he amended the complaint that was removed to this court to include claims based upon those alleged violations.  Defendant's contention that plaintiff failed to exhaust his administrative remedies therefore fails.

II. Plaintiff's Common Law Wrongful Constructive Termination Claim

As noted above, plaintiff alleges that defendant Bimbo maintained a "sexually hostile and/or retaliatory work environment" with the intent that he resign, "and/or with knowledge that if its actions continued it would be

16 - OPINION AND ORDER

substantially certain he would do so."  Plaintiff contends
that defendant Bimbo's decision to transfer him to Tigard was
made in retaliation for his opposition to its hostile work
environment.

In order to establish a claim of constructive discharge,
a plaintiff must prove that the employer intentionally created
or maintained specified working conditions which were so
intolerable that a reasonable person in the employee's
position would have resigned, that the employer intended to
cause the employee to leave as a result of the conditions, or
knew that the employee was certain, or substantially certain,
to leave as a result of the conditions, and that the employee
did in fact leave as a result of the conditions.  McGanty v.
Staudenraus, 321 Or. 532, 557, 901 P.2d 841 (1995).  In order
to establish that a termination was "wrongful," a plaintiff
must show that he was terminated for 1) pursuing an important
public or societal obligation, or 2) for exercising an
employment-related right of important public interest.  Patton
v. J.C. Penney Co., 301 Or. 117, 120, 719 P.2d 854 (1986).  A
plaintiff must show that his "protected activities" were a
"substantial factor" in his termination.  Holien v. Sears,
Roebuck and Co., 298 Or. 76, 90 n.5, 689 P.2d 1292 (1984).

Defendant Bimbo is entitled to summary judgment on
plaintiff's constructive wrongful discharge claim for several
reasons.  First, plaintiff has not shown evidence from which a
trier of fact could conclude that the conditions at

17 - OPINION AND ORDER

defendant's workplace were so severe that a reasonable person in plaintiff's position would have resigned.  Whether the evidence will support a sexually hostile environment claim under state and federal statutes will be discussed more fully below.  However, for the purposes of analyzing plaintiff's wrongful constructive termination claim, it is sufficient here to note that a reasonable jury could not conclude plaintiff's work conditions were objectively so intolerable that a reasonable person in plaintiff's position would have resigned. Certainly, there is evidence that Marshall made a number of comments about homosexual conduct, and that some of Felty's conduct made plaintiff uncomfortable.  However, drawing all reasonable inferences concerning the conduct of these two in plaintiff's favor, as is required in analyzing the pending motion, this evidence does not describe sexual harassment that was sufficiently severe or pervasive to support a constructive termination claim.

Second, plaintiff has not shown the existence of evidence from which a reasonable trier of fact could conclude that defendant Bimbo subjected plaintiff to intolerable conditions with the intent that plaintiff resign or with the knowledge that plaintiff would likely leave.  Instead, the evidence supports only the conclusion that defendant Bimbo wanted to retain plaintiff as an employee.  Plaintiff was promoted to a foreman position only 90 days after he was hired, and received positive reviews while working for defendant Bimbo.  After

Felty complained about plaintiff's conduct, plaintiff was counseled about how to deal with other employees, and there is no indication that defendant Bimbo was dissatisfied in any way with his conduct.  There is no evidence that, in transferring plaintiff to its Tigard facility, defendant Bimbo intended to cause plaintiff to resign.  The evidence supports only the conclusion that plaintiff's hours, pay, and status as a foreman would have remained unchanged at the Tigard facility. In addition, plaintiff would have had no contact with Marshall at that location, and would have encountered Felty less often. Under these circumstances, there is no support for the conclusion that the transfer to Tigard was in any way designed or intended to speed plaintiff's departure.

Finally, as noted above, a constructive discharge is wrongful only if it is based upon a plaintiff's exercise of an employment-related right of important public interest, or is carried out in response to an employee's discharge of an important public or societal obligation.   Even if the evidence would support the conclusion that plaintiff was subjected to intolerable conditions and that defendant Bimbo intended or expected that plaintiff would resign, the evidence would not support the conclusion that defendant maintained these conditions in response to plaintiff's objection to the conduct plaintiff cites in support of his discrimination claims.

III. <u>Plaintiff's State and Federal Discrimination Claims</u>

Both Oregon law and Title VII prohibit discrimination upon the basis of an employee's sex and retaliation based upon an employee's opposition to unlawful discrimination. Or. Rev. Stat. §§ 659A.030(a), (f); 42 U.S.C. § 2000e <u>et</u> <u>seq</u>. Oregon courts construe Oregon anti-discrimination statutes as identical to their federal counterparts. <u>See</u>, <u>e.g.</u>, <u>School Dist. No. 1 v. Nilsen</u>, 271 Or. 461, 469, 534 P.2d 1135, 1139 (1975); <u>Meltebeke v. Bureau of Labor and Indus.</u>, 120 Or. App. 273, 282 n. 4, 852 P.2d 859 (1993) (Edmonds, J., specially concurring); <u>Hillesland v. Paccar, Inc.</u>, 80 Or. App. 286, 294, 722 P.2d 1239, <u>rev</u>. <u>denied</u>, 302 Or. 299, 728 P.2d 531 (1986). In addition, federal courts apply the same analytical standard in evaluating motions for summary judgment concerning discrimination claims brought under both state and federal law. <u>See</u> <u>Snead v Metropolitan Prop. & Casualty Ins. Co.</u>, 237 F.3d 1080 (9th Cir.), <u>cert</u>. <u>denied</u>, 534 U.S. 888 (2001). Accordingly, I will apply the same analysis, and rely on federal decisions, in analyzing the pending motion as to both plaintiff's state and federal hostile environment and retaliations claims.


A. <u>Hostile Environment Claims</u>

1. <u>Establishing a hostile environment claim</u>

It is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such
individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  See also
Or. Rev. Stat. § 659A.030(1)(a).  This proscription of
discrimination prohibits subjecting employees to sexually
hostile work environments.  Harris v. Forklift Systems, Inc.,
510 U.S. 17, 21 (1993).

    A plaintiff may establish a "hostile environment" claim
by showing that he was subjected to verbal or physical
harassment that was sexual in nature, that the harassment was
unwelcome, and that the harassment was "sufficiently severe or
pervasive to alter the conditions of the plaintiff's
employment and create an abusive work environment."  Gregory
v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998).  A plaintiff
must establish that the conduct at issue was both objectively
and subjectively offensive: He must show that a reasonable
person would find the work environment to be hostile or
abusive, and that he in fact found it to be so.  Faragher v.
City of Boca Raton, 524 U.S. 775, 787 (1998).  The objective
severity of the harassment must be evaluated from the
perspective of a reasonable person in the plaintiff's
position, considering "all the circumstances."  Harris, 510
U.S. at 23.

    In determining whether a work environment is sufficiently
hostile or abusive to violate the law, courts consider the
"frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. The level of severity of the conduct required to support a Title VII hostile work environment claim "varies inversely with the pervasiveness or frequency of the conduct." Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991).

These principles apply equally whether the acts giving rise to a complaint are carried out by a person or persons of the same sex as the plaintiff, or by a person or persons of the opposite sex. Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79 (1998). Though "proposals of sexual activity" will support an inference of discrimination, "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Id. at 80. In all sexual harassment cases, including "same-sex" cases, determining whether a "reasonable person" would have found the work environment hostile or abusive "requires careful consideration of the social context in which the particular behavior occurs and is experienced by its target." Id. at 81.

> The real social impact of workplace behavior
> often depends on a constellation of surrounding
> circumstances, expectations, and relationships
> which are not fully captured by a simple recitation
> of the words used or the physical acts performed.
> Common sense, and an appropriate sensitivity to
> social context, will enable courts and juries to
> distinguish between simple teasing or roughhousing
> among members of the same sex, and conduct which a
> reasonable person in the plaintiff's position would
> find severely hostile or abusive.

22 - OPINION AND ORDER

<u>Id.</u>  The Supreme Court has emphasized that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  <u>Farragher</u>, 524 U.S. at 788 (citation and internal quotation marks omitted).

Where, as here, an employee is allegedly harassed by co-workers, the employer may be liable if it knows or should know of the harassment but fails to take steps "reasonably calculated to end the harassment."  <u>Nichols v. Azteca Restaurant Enterprises, Inc.</u>, 256 F.3d 864, 875 (9th Cir. 2001) (quotations omitted).  The reasonableness of the employer's remedy depends on the ability of the remedy to stop the harassment, and to persuade other potential harassers to refrain from unlawful conduct.  <u>Id.</u>

2.  <u>Analysis</u>

Plaintiff's assertion that he was subjected to a hostile work environment is based upon the alleged conduct of Felty and Marshall.  Of these two, Felty's conduct appears to have caused plaintiff the most concern.

Before analyzing whether the evidence in the record could support plaintiff's hostile work environment claims, I note that it is difficult to credit plaintiff's assertion that Felty actually wanted to have a sexual relationship with him: The record includes substantial uncontradicted evidence that Felty and plaintiff disliked and disrespected each other, and

that their working relationship was extremely strained.
Felty repeatedly complained that plaintiff would not work
cooperatively, made negative comments, used profanity, and was
physically threatening.  Likewise, though Kanyo and Johnson
dispute some of plaintiff's assertions about his complaints
regarding Felty's conduct, these managers agree that plaintiff
also complained repeatedly about Felty.  Though it is not
unheard of for persons to "come on" to or be "overly-friendly"
to people they do not like, and for people to want to have
intimate relationships with people they strongly dislike, it
is at least unusual.  Given that plaintiff and Felty clearly
disliked each other, it is difficult to believe that Felty
truly wished to have an intimate relationship with plaintiff,
and sought to entice him into such a relationship.

Defendant Bimbo's motion for summary judgment on
plaintiff's hostile work environment claims does not, of
course, turn on the plausibility of plaintiff's assertion that
Felty sought to engage in an intimate relationship with him:
If sufficiently severe and pervasive, Felty's conduct, even if
insincere, could have created a hostile work environment.
Nevertheless, the acrimonious work relationship between
plaintiff and Felty is part of the "constellation of
surrounding circumstances, expectations, and relationships"
which the Supreme Court has emphasized must be considered in
evaluating same-sex harassment claims.  See Oncale, 523 U.S.
at 79.  The context in which Felty acted must be considered in

answering the critical question here, which is whether
plaintiff has shown the existence of evidence from which a
reasonable trier of fact could conclude that he was subjected
to unwelcome verbal or physical harassment that was
sufficiently severe or pervasive to alter the conditions of
his employment and create an abusive work environment.

From his own deposition testimony, there is adequate
evidence that plaintiff subjectively considered the conduct of
Felty and Marshall sufficiently severe or pervasive to create
an abusive work environment.  The remaining issue is therefore
whether the evidence before the court could support the
conclusion that a reasonable person in plaintiff's position
would have found his work environment to be sufficiently
hostile or abusive to support a legal action.

As noted above, in determining whether a work environment
is sufficiently hostile or abusive to violate the law, courts
consider the frequency and severity of discriminatory conduct,
whether the conduct is physically threatening or humiliating
or is simply an offensive utterance, and whether the conduct
unreasonably interferes with the plaintiff's work performance.
As the Supreme Court has emphasized, "simple teasing, offhand
comments, and isolated incidents (unless extremely serious)"
are not sufficient to alter the terms and conditions of
employment.  <u>Breeden</u>, 532 U.S. at 270-71.  The Supreme Court
has also noted that courts must apply common sense and "an
appropriate sensitivity to social context" to distinguish

between teasing or "roughhousing" among members of the same
sex and conduct that a reasonable person would find "severely
hostile or abusive."  Oncale, 523 U.S. at 79.

Applying these principles in a careful examination of the
record before the court, I conclude that defendant Bimbo is
entitled to summary judgment on plaintiff's hostile work
environment claims.  Plaintiff's evidence is not strong or
compelling, and the record simply will not support the
conclusion that the conduct of which plaintiff complains was
pervasive or severe, or unreasonably interfered with
plaintiff's work performance.  There is no evidence that Felty
or Marshall ever touched, threatened to touch, or attempted to
touch plaintiff, and there is no evidence that Marshall in any
way suggested or implied that he sought a physical
relationship or sexual contact with plaintiff.  There is no
evidence that the conduct of either Felty or Marshall was
physically threatening or truly humiliating.  Plaintiff has
testified that Felty drove a truck menacingly close to him on
occasion and now attributes that to plaintiff rebuffing
Felty's advances.  However, there is no evidence that
plaintiff made this type of complaint at the time, ambiguous
evidence of whether any actual advances were made, and no real
evidence of any connection between sexual issues and driving
issues.  In the context of the admittedly long-term ongoing
acrimonious relationship between plaintiff and Felty, only an
impermissible speculation could support this causal

relationship.  Applying common sense to the context in which plaintiff asserts that this conduct occurred, a reasonable trier of fact could only conclude that, if Felty did threaten plaintiff with his vehicle, it is equally or more likely that he did so because he disliked plaintiff and was angered by plaintiff's work-related conduct and complaints to management about the drivers.

Plaintiff has testified that, from late 2004 and continuing until he resigned in late September, 2005, Felty indicated through his words and actions that he sought a sexual relationship with him.  However, accepting plaintiff's uncorroborated recollection of Felty's conduct during this time as true, the conduct in question was not sufficiently severe or pervasive to support a hostile work environment claim.  Plaintiff testified that Felty asked him about his sexual preference once, commented on plaintiff's tan "a couple of times," and commented on his weight loss and told him that he was "looking good" between two and five times.  This conduct cannot be fairly characterized as severe or pervasive.

Accepting plaintiff's recollection of events, Felty told plaintiff that he liked males, told plaintiff he "wanted" him, and once asked plaintiff if he "had a big dick" and said that he "liked that sort of thing."  However, there is no evidence that Felty made such comments often, and plaintiff has also testified that Felty told plaintiff that he was heterosexual. In addition, though Felty told plaintiff he wanted to have a

"relationship" with him, which plaintiff interpreted as meaning a sexual relationship, there is no evidence that Felty made this statement repeatedly, stated that he was interested in a <u>sexual</u> relationship, asked plaintiff out, or took other steps to establish an intimate relationship with plaintiff.

A trier of fact crediting plaintiff's recollection of events could conclude that Felty made plaintiff uncomfortable by invading his "space" a number of times, and made kissing sounds once or twice when plaintiff walked away. However, this conduct cannot be characterized as "severe" as that term is used in reported decisions discussing hostile work environment claims.

In addition to this evidence concerning Felty's conduct, plaintiff has also submitted evidence that Marshall, who is openly gay, made sexual comments and a gesture that plaintiff found offensive. This includes evidence that Marshall once made a masturbation motion to plaintiff, once jokingly asked plaintiff if he had been "sucking too much dick," and commented about anal sex and jokingly asked plaintiff if he enjoyed that sexual practice. Marshall testified that he told plaintiff about what he characterized as "sexcapades" and certain of his sexual experiences, including "fist fucking," told plaintiff that he had seen another man getting a "blow job" in a bar, told plaintiff about a sexual position that he preferred, and told plaintiff that he had herpes in the back of his throat.

Marshall's conduct may have been subjectively offensive to plaintiff and would be considered objectively offensive to many reasonable people. However, this conduct, considered along with the conduct of Felty discussed above, was not sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment and create a hostile work environment. There is no evidence that Marshall sought a physical relationship with plaintiff, and plaintiff testified that Marshall made the comments in question because he knew that plaintiff was not gay. Like Felty, Marshall never touched plaintiff, attempted to touch plaintiff, physically threatened plaintiff, or subjected plaintiff to conduct that was objectively humiliating. Marshall's conduct simply was not severe or pervasive enough to create an objectively hostile work environment.

Plaintiff has not shown the existence of evidence from which a reasonable trier of fact could conclude that he was subjected to verbal or physical sexual harassment that was objectively sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment. There is no evidence that the conduct of which plaintiff complains unreasonably interfered with plaintiff's work performance. Though the conduct in question may have been subjectively offensive, it was simply not severe or frequent enough to support hostile work environment claims.

Defendant Bimbo is therefore entitled to summary judgment on plaintiff's work environment claims.

B. Retaliation claims

In order to prevail on his retaliation claims, plaintiff must prove that he was subjected to an adverse employment action because he acted to protect his rights under Title VII or related state law. E.g., Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002).

Plaintiff contends that defendant Bimbo subjected him to an adverse employment action by transferring him to its Tigard facility and constructively terminating him, and that it did so in retaliation for his repeated opposition to a hostile work environment. However, the record before the court will not support that conclusion. For the reasons set out in the discussion of plaintiff's wrongful constructive termination claim above, I conclude that plaintiff cannot establish that he was constructively discharged. I also conclude that he cannot establish that his transfer to the Tigard facility constituted an adverse employment action. As noted above, the evidence supports only the conclusion that plaintiff's hours, pay, and status would have remained unchanged, and that the transfer would have cut off plaintiff's contact with Marshall altogether, and would have significantly reduced plaintiff's contact with Felty. In addition, there is no evidence that defendant Bimbo's decision to transfer plaintiff to the Tigard

facility was in any way related to plaintiff's complaints about Felty and Marshall. Plaintiff has shown the existence of no evidence that could refute defendant Bimbo's assertion that it sought to transfer plaintiff to the Tigard facility for legitimate business reasons.

In the absence of evidence that plaintiff was subjected to an adverse employment action, or that the transfer of which he complains was made in retaliation for his complaints about a hostile work environment, defendant Bimbo is entitled to summary judgment on plaintiff's retaliation claims.

## CONCLUSION

Defendant Bimbo's motion for summary judgment (#17) is GRANTED.

DATED this 4th day October, 2006.

/s/  John Jelderks
John Jelderks
U.S. Magistrate Judge